# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7907 | **DATE** | 8/1/2001 |
| **CASE TITLE** | | Grayson vs. O'Neil | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Defendant's motion for summary judgment on all remaining claims is granted. Plaintiff's motion to strike the Secret Service's statement of facts and his motion to deem certain facts admitted are denied. The court having previously dismissed the retaliation claim as time barred, judgment is entered in favor of defendant and against plaintiff. Enter Memorandum Opinion and Order. Any pending motion in this case is terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

2
number of notices

AUG 0 2 2001
date docketed

8/1/2001
date mailed notice

MPJ
courtroom deputy's initials

AO
30-7
FILED FOR DOCKETING
01 AUG -1 PM 5: 00

Date/time received in central Clerk's Office

docketing deputy initials

MPJ
mailing deputy initials

Document Number

101

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

RALPH L. GRAYSON,           )
                            )
          Plaintiff,        )
                            )
     v.                     )     No.  98 C 7907
                            )
                            )     AUG 2 2001
PAUL O'NEIL, SECRETARY OF   )
TREASURY,                   )
                            )
          Defendant.        )

### MEMORANDUM OPINION AND ORDER

From 1993 to 1997, Ralph Grayson, an African American man, was
Special Agent in Charge ("SAIC") of the Chicago Field Office of the
United States Secret Service. In July 1997, he was removed from
that position after an investigation into complaints made by
Special Agents who worked or had worked under him. Grayson was
reassigned to Washington, D.C., and retired from the Secret Service
in the Spring of 1998. After timely filing charges with the EEOC,
he received his right to sue letter, and sued under Title VII, 42
U.S.C. § 2000e-5, alleging retaliation (count I) and intentional
racial discrimination (count II), and constructive discharge (count
III). I dismissed the retaliation claim as time barred in a minute
order of August 6, 1999. The Secret Service moves for summary
judgment on all remaining counts, and I grant the motion. I also
decide several other motions.



Grayson joined the Secret Service in 1974, and served in many responsible positions, including SAIC Columbus, Ohio (1986-88), SAIC Birmingham, Alabama (1998-90), and SAIC Forgery Division, Washington, D.C. (1991-1993). He took over as SAIC in Chicago in 1993, supervising over 100 personnel in one of the Secret Services' largest offices. Under his administration the Chicago field office was recognized for its arrest record in fighting counterfeiting and fraud in the telecommunications industry. Through 1996, he received outstanding individual performance evaluations, as well as bonuses and various awards from federal and municipal authorities.

Despite this, Grayson claims, he lost his position and was ultimately forced to retire because of race. The Secret Service demurs, attributing the end of Grayson's Secret Service career to his own unsatisfactory performance. Grayson offers evidence of racist misconduct in the Secret Service, including evidence of the "Good Ol' Boy Roundups," annual events occasionally featuring grossly racist signs, t-shirts, skits, and so forth in which, he says, Secret Service and other federal agents participated from 1980 to 1995. Grayson says that he challenged the "good old boy" network, offering support and encouragement to minority Secret Service employees. In March 1997, Grayson recommended that another African American agent, Isaiah Mapp, be promoted to be Assistant SAIC ("ASAIC"), the number two position in the office. Mapp was

passed over in favor of a white agent. According to Grayson, it was this recommendation that triggered the events leading to this lawsuit.

The Secret Service has a different account. In February 1997, a woman Special Agent complained that Grayson had criticized her in front of others. After an initial investigation, which determined that she was not entitled to relief, she amended the grievance in March 1997, claiming that Grayson had retaliated against her for complaining by assigning her to another task force at an inconvenient office. The amended complaint was investigated by fact finders, and then by special investigators from the Secret Service's Office of Internal Investigations, who conducted an extensive inquiry. This uncovered a flood of complaints about Grayson's performance from his subordinates.

In April 1997, the investigators submitted a Management Review Report that found that: (1) Employee morale in the Chicago Field Office was low in part because Grayson focused on arrest statistics while ignoring his subordinates' exhaustion. (2) There were reports of mismanagement, including complaints that Grayson intimidated and threatened retaliation against his employees, e.g., threatening to lower an agent's performance review for asking to discuss it. (3) There were reports of a pattern of "sexual harassment," including alleged obnoxious sexual references, but no reported instances of attempted sexual coercion; and allegations that he disliked women

agents. (4) There were reports from interviewees of racial bias towards minorities, *e.g.*, that Grayson replaced a white with an African American agent during a visit by a foreign dignitary, and gave African Americans more training and other opportunities than whites. (5) Finally, the report contained statements from Secret Service Agents and outside providers that Grayson required his agents to solicit free services and other perks for his personal use, such as health club passes, hotel rooms, a meeting with Oprah Winfrey for his wife and friends, special parking places at Chicago Bulls games, and so was "known as a joke" in local law enforcement because he was always looking for something free.

In July 1997, Grayson received an "unsatisfactory" rating in his annual performance review, which referred to the findings in the Management Review Report. In August 1997, he was transferred to Washington, D.C., on a temporary basis. Ultimately, the Secret Service prepared to discipline Grayson, but offered him the opportunity to retire before charges were filed. He retired early in March 1994.

II.

A.

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329 (1986); Fed. R. Civ. P. 56(c). The party opposing the

-4-

motion must come forward with evidence such that "a reasonable jury could return a verdict for [him]." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). I construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999).

A plaintiff may meet his burden of proof under Title VII by offering either direct proof of discriminatory intent or by proving disparate treatment through the indirect, burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997). For a prima facie "indirect" *McDonnell Douglas* case, Grayson must demonstrate that (1) he belongs to a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) his employer treated similarly-situated employees outside of his protected class more favorably. *Stockett v. Muncie, Ind., Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000). If the employee does not have an exemplary employment record, he must show that "although he was not a good employee, equally bad employees were treated more leniently by [the employer] if they happened not to be black." *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993). The Secret Service may produce evidence of "a legitimate and nondiscriminatory reason for the employment decision," *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081,

1088 (7th Cir. 2000), which the plaintiff must rebut with evidence that the Secret Service's stated reason is merely a pretext. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999). A factfinder's rejection of the Secret Service's nondiscriminatory reason may itself be enough to find for the plaintiff on the issue of liability. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993). However, when an employer articulates a lawful reason for discharging the plaintiff, "it is not [my] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Giannopoulos v. Brach & Brock Confections Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

## B.

The basic issue here is whether Grayson was treated worse than other employees who were equally bad and who were not African American, which is also his case for pretext. As an African American, Mr. Grayson is in a protected class. The Secret Service does not dispute that Grayson was subject to adverse action, and being demoted from a responsible position and transferred to what I must here assume is a makework job 800 miles away is clearly adverse action. I deal with Grayson's job performance under the pretext inquiry. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 394 (7th Cir. 1998) (citing cases authorizing this).

The Secret Service argues that Grayson was not treated worse that similarly situated whites because there was no one else who had been accused of such a wide-ranging collection of misdeeds. Grayson responds that several white agents were suspected of far worse misbehavior than he was charged with in the incident that triggered the initial inquiry, but were subject to investigations that were far more limited in scope, and given far more trivial discipline. Therefore, he says, he was treated worse than similarly situated whites, and a jury could conclude that the Management Review Report was just a pretext for firing him because of race.

1.

I begin with the Secret Service's appraisal of Grayson's conduct. The defendant says that it stripped Grayson of his job as SAIC in Chicago, sent him to Washington, and offered him the alternatives of retiring or facing disciplinary charges, because it believed the allegations in the Management Review Report, including allegations (to recap briefly) of: (1) low employee morale due to concentration on arrests, (2) mismanagement, intimidation, and threats of retaliation; (3) a pattern of sexual harassment, (4) racial bias in favor of minorities; and (5) solicitation of free services and other perks for personal use, to the point of being known as a "joke" in Chicago law enforcement. The report, which is very extensive, includes scores of complaints by many different employees in the Chicago office.

Grayson objects that the report is hearsay, but that is not to the point. It may be admissible for another purpose, such as to show the information available to the decisionmakers in the case. "Because a Title VII claim requires intentional discrimination, the . . . inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate." *Helland v. South Bend Comm. Sch. Corp.*, 93 F.3d 327, 330 (7th Cir. 1996) (pretext context). I consider not whether the charges are true, but only whether Grayson could persuade a rational jury that the "the defendant did not honestly believe" its stated reasons for the challenged decision. *Crim v. Board of Ed. of Cairo Sch. Dist. No. 1,* 147 F.3d 535, 541 (7th Cir. 1998).

Any substantial single subset of the five classes of charges against Grayson would be enough reason, if honestly believed, for the Secret Service to remove him from his position. Therefore, to conclude that the Secret Service did not really believe the charges, I would have to determine that the whole report was a frameup. Construing all facts in the best light for Grayson and drawing all reasonable inferences in his favor, I find only two areas where a  jury might reasonably doubt the Secret Service's honest belief in the allegations. That is not enough.

The "sexual harassment" charges were, on the evidence of the report, "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers," *Baskerville v. Culligan Int'l Co.,*

50 F.3d 428, 430 (7th Cir. 1995), that the Seventh Circuit has stated is not actionable. *Id.* Of course, misbehavior need not be actionable at law for it to be a basis for discipline at work. But under the summary judgment standard, I must read Grayson's alleged conduct in as innocent a light as possible, and so interpreted, a rational jury might conclude that, if these particular sexual harassment charges were all the Secret Service had, its professed reason was pretextual. Likewise, read in the light most favorable to Grayson, the allegations that he showed favoritism towards African Americans are hard to credit, particularly when the Secret Service itself is committed to goals of diversity. But this is not all the basis that the Secret Service had.

The Management Review Report also contains charges where such doubts would not arise, at least far as Grayson has shown. First, it involves much evidence that morale in Grayson's office was low because of a single-minded concentration on arrests. Grayson argues that he had been recently given awards and bonuses for that very arrest record. This is nonresponsive. The arrest record was good, but the Secret Service still might well believe that the conditions he imposed on the office to attain this good record were very troubling. Second, there is also the category of complaints about mismanagement, intimidation, and retaliation. Grayson denies that there is anything to this, but the complaints about these problems were not so manifestly incredible that a rational jury could not

conclude that the Secret Service believed them. Third and finally there are the charges that Grayson was a cheapskate on the prowl for free perks, who would often send agents out to nab freebies to which he was not entitled, and whom the law enforcement community regarded as a "joke" for this reason. Grayson responds that he was a recipient of local recognition from the City of Chicago, as well as of outstanding performance evaluations, and had been recently recommended by his superiors for a Meritorious Presidential Rank Award. These evaluations and recommendations, however, antedated the investigation. Grayson was well regarded by his superiors until they were apprised of a large number of complaints about his performance. They are not barred from subsequently removing him for misbehavior merely because they had earlier given him awards and recommendations before they had heard and come to believe complaints such as those discussed here.

2.

The Secret Service had evidence from which it could have come to the belief that Grayson was not a good employee, but the law "protect[s] average and even below-average workers against being treated more harshly than would be the case if they were of a different race." *Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). If the Secret Service treated equally deficient white employees who were similarly situated better than Grayson, he has a case. One sort of evidence concerns several white SAICs who were

-10-

investigated for misconduct, but disciplined less seriously than Grayson. The second set concerns officials who were not disciplined at all in connection with the Good Ol' Boy Roundups. I deal with these in turn.

SAIC #1[1] was accused of sexual harassment for warning a subordinate about a personal relationship, including statements such as "[I]t's hard to think rationally when you are on your back with your legs in the air." Grayson introduces evidence that there was no investigation of the matter beyond questioning SAIC #1, and no discipline was imposed on him. SAIC #2 approved a bridal shower to be held at work including a male stripper as entertainment. After an investigation, it was recommended that he be suspended without pay for 15 days. SAIC #2 had previously been suspended without pay for criticizing a subordinate, a woman Special Agent for marrying another agent. A third SAIC, #3, was investigated after serious charges were made that he abused his children, pointed his weapon at an employee, and exposed himself. Eljay Bowron, then Assistant Director of the Secret Service, and subsequently Director during the events at issue here, investigated at the SAIC's field office. He found no support for the most serious charges, but discovered complaints of mismanagement and

---

[1] The names of these agents are redacted under a protective order. The parties refer to the individual I call "SAIC No. 3" by the name of the city where he worked. In the interests of confidentiality, I refer to him, as to the others, only by number.

communications. SAIC #3 was threatened with removal if the problems were not rectified, but he was not removed. Bowron testified that "not long after that," SAIC #3 retired.

Grayson argues that a jury might reasonably regard the Management Team's investigation and its results as a suspiciously disproportionate response to a fairly insignificant initial complaint, especially in view of evidence he has brought forward of less rigorous investigation of misconduct by the white SAICs ##1-3. However, even supposing so, it would not follow that the Secret Service did not honestly believe its results. And Grayson has not come forward with evidence that the investigation was improperly motivated. The initial complaint that Grayson had inappropriately criticized a woman in front of others was found to be without merit after a cursory investigation less rigorous than those involved in the cases of the three SAICs; an amended complaint charging retaliation was investigated by the team of special investigators, which turned up the large amount of evidence set forth in their report of problems with Grayson's performance on other matters. It was not improper to investigate the further complaints that came to light when the investigators looked into the amended initial complaint. Grayson does not argue that the Secret Service fabricated the complaints out of whole cloth.

The investigations of the alleged misconduct in the case of the three SAICs are disanalogous, and indeed these are not

similarly situated employees who were treated better than Grayson. With SAICs #1 and #2, the investigations of their charges did not turn up any new complaints outside those originally being investigated, whereas the investigation of Grayson did. Additionally, the allegations that were investigated with SAICS #1 and #2 were much less serious than those for which Grayson was ultimately removed from his position. SAIC #1 was not disciplined for sexual harassment, but his remarks, though offensive, were no worse than Grayson's own vulgar banter, which I have said would probably not be a basis for summary judgment against him if it were all the Secret Service had. SAIC #2 was indeed suspended without pay for condoning a single incident, allowing a male stripper at an office party, which is not comparable to the range and diversity of the misconduct Grayson is accused of, even when I have discounted the complaints that a rational jury could reject on the evidence Grayson has produced.

SAIC #3 is a better candidate for a similarly situated employee, although he too falls short. With him, an investigation into very serious charged misconduct--child abuse, indecent exposure, pointing guns at subordinates--was carried out by then-Assistant Director of the Secret Service Eljay Bowron, who found the most serious charges to be groundless;[2] but his informal

---

[2] The entire evidence in the record of the matter with SAIC #3 is Bowron's deposition testimony. Grayson requested the records for his field office, but the government affirms that there are no

inquiries uncovered collateral complaints of mismanagement and communications problems. SAIC #3 was threatened with removal, but he retired before any action could be taken against him. Being removed is adverse action, so Grayson could argue that he was treated more poorly; and there is no evidence to support the Secret Service's claim that SAIC #3 was given Grayson's choice: that is, to quit or face disciplinary proceedings. However, the allegations about Grayson's performance were worse than those about SAIC #3's, including not only poor morale, miscommunications, and mismanagement, as with SAIC #3, but also embarrassing freeloading as well as intimidation and retaliation. Therefore. SAIC #3 was not in fact similarly situated. *See Bush*, 990 F.2d at 931 (less-than-exemplary employee must show that "equally bad" employees were treated more leniently).

Grayson urges that he was treated worse than SAIC #3 because he was the subject of a Management Review, while SAIC #3 was not. However, there is no reason to think that, in the circumstances, the different form of the investigation was a relevant difference or worse treatment. *See O'Hara v. Illinois Dep't of Mental Health*, 120 F. Supp. 2d 704, 708 (N.D. Ill. 2000) (Investigations of African-American employee in connection with sexual assault and

---

records pertaining to Bowron's investigation of the matter, and that no investigative files were created. Grayson admits that he did not specifically request a deposition of SAIC #3, although he would have been entitled to take one had he desired to do so.

anonymous death threat were not "adverse employment actions."). As I said in *O'Hara*, the discrimination laws should not be interpreted to discourage employers from conducting proper and desirable inquiries. *Id.* Investigating an employee merely to harass him because of his race would be illegal, but harassment is not alleged here, and an employer need not institute a full-scale Management Review in every case, whether or not the facts call for it, to avoid a discrimination lawsuit.

3.

As part of his evidence, Grayson also offers (1) the refusal to promote Isaiah Mapp, an African American; (2) affidavits from minority Secret Service agents in *Moore, et al. v. Summers*, No. 00-953 (D.D.C.), filed Aug. 15, 2000, reporting widespread discrimination, experienced and observed by others, and (3) the Department of Justice's own March 1996 Report by the Office of the Inspector General on "Allegation of Racial and Criminal Misconduct at the Good Ol' Boy Roundup" (the "OIG Report"). Evidence of generalized racism or even discrimination directed at others is not germane unless it has "some relationship with the employment decision in question." *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). The evidence must "reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria." *Id.* The Secret Service's choice of a white agent over Mapp does not itself show racism, and the affidavits in *Moore* are not tied to

this employment decision in any clear way. But the OIG report is troubling. I became concerned that the record might include evidence that Eljay Bowron, Secret Service Director and the main relevant decisionmaker in this affair, condoned or failed to punish subordinates for participating in intolerable racist misconduct at the Roundups. Whether I analyze this as direct evidence of discrimination or indirect evidence of dissimilar treatment of similarly situated individuals, if Grayson had evidence of such lenience, that might provide sufficient basis for denial of summary judgment. I ordered supplemental briefing on the matter, and now conclude that the evidence in the record does not support the concern about Bowron.

The Roundups were annual events attended by law enforcement personnel from 1980 through 1996 or so. Some of these Roundups involved shockingly racist conduct, particularly in 1990-1992, during which years, the OIG Report found, e.g., that in 1990, a "Nigger Checkpoint" sign with a circle/slash around a black persons's head was posted; that people approached cars and asked whether there were "niggers inside," and there was a racist skit involving a "slave" in blackface performing oral sex on a "Klansman." In 1992, a subsequent Roundup President posed with a Confederate flag making obscene and inappropriate gestures. There were signs posted at the campsite saying "no niggers" and "nigger checkpoint." That year a policeman participant performed a skit

involving smashing open a watermelon and pulling out a black painted doll, saying that one had to "kill the seed while it was young." Racist t-shirts were offered for sale in 1991, 1992, and 1995. Secret Service agents was elected "President" of the 1985 and 1989 and 1990 Roundups.

So far this reflects an appalling atmosphere of racism in certain subterranean (and, one hopes, sparsely inhabited) reaches of the law enforcement community, but not racism connected with the decisionmaker or the decision here. However, Grayson argues the worst incidents of racism occurred at the Roundups while Eljay Bowron was SAIC Atlanta, Georgia, in 1989-92, and that Buster Williams, a supervisory agent the Atlanta Field Office under Bowron, was an organizer of the Roundups during that period, and was not punished. If true, that might show a decisionmaker's propensity to act from forbidden motives, as well as more lenient treatment of similarly situated whites. Grayson offers the affidavit of Jenell Walker-Clark, then a Secret Service Special Agent in Atlanta. She states that Williams was ASAIC there from 1994 to 1996, and that he "took part in organizing and promoting" the Roundup during 1994-96, and was not disciplined for it.

The problem is that, according to the OIG Report, the really appalling conduct at the Roundups occurred in 1991-92, not after 1994. The only evidence for the period when evidence places Williams in Atlanta is that in 1995 someone unknown, perhaps not

even a law enforcement official, offered racist t-shirts for sale at a Roundup. I can't attribute that to Bowron or Williams. Grayson then argues that "it can reasonably be inferred" that Williams was in the Atlanta Field Office from 1989 to 1996. He refers again to Walker-Clark's testimony, but she herself arrived in Atlanta only in 1994, and she says nothing about where Williams was or what he had done before then. Grayson also refers me to the affidavit of Cheryl Tyler, a Secret Service Investigator who states that unnamed Secret Service agents participated in racist activities at various Roundups. Tyler does not say where she was located, but her supervisor was ASAIC Lee Wagner, not Buster Williams. I draw every reasonable inference in Grayson's favor, but no rational jury could conclude from these two pieces of evidence that Williams was even in Atlanta in 1991-92, much less that he participated in organizing racist excesses in 1990-92 with the condonation or toleration of Eljay Bowron.

I conclude, therefore, that Grayson has not carried his summary judgment burden by showing that he was treated worse than similarly situated white employees, or that there is any direct or circumstantial evidence that his removal and transfer were because of his race rather than because of the Secret Service's honest belief in the credible portions of the Management Report about his deficient performance. There is no evidence of pretext. Grayson was legitimately removed from the position of SAIC Chicago.

## C.

Grayson argues that he was constructively discharged by being threatened with disciplinary proceedings if he did not resign or retire. Constructive discharge "is a judicially-created response to the fact that Title VII, as originally enacted, afforded no damages remedy to a harassment victim for emotional trauma or even for medical expenses [he] may have incurred." *Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1005 (7th Cir. 1994). "Thus, courts have said that where conditions are so intolerable that a reasonable person would feel compelled to resign, a plaintiff may do that, and then sue." *Id.* For constructive discharge, Grayson must show that (1) the Secret Service made his workplace intolerable, *Drake v. Minnesota Mining & Mfg.,* 134 F.3d 878, 886 (7th Cir. 1998), and (2) "the underlying working conditions were themselves unlawful (*i.e.,* discriminatory in some fashion)." *Sweeney v. West,* 149 F.3d 550, 557-58 (7th Cir. 1998). More than ordinary discrimination is necessary to establish a constructive discharge claim; in the ordinary case, an employee is expected to remain employed while seeking redress. *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (7th Cir. 1997). Grayson's situation was certainly uncomfortable. But the intolerability must be because of the illegal discrimination. *Drake,* 134 F.3d at 887. Grayson's constructive discharge case thus depends on his theory that the investigation and disciplinary process were a racist frameup. He

has not met his burden of producing evidence that would persuade a rational trier of fact of this claim, so his constructive discharge claim fails.

## III.

I GRANT the Secret Service's motion (1) for summary judgment on counts  II and III. I DENY Grayson's motions (1) to strike the Secret Service's statement of facts, and (2) to deem certain facts admitted.

ENTER ORDER:

**Elaine E. Bucklo**
United States District Judge

Dated:    August |  , 2001